N. P. GASAWAY et al., Appellants,

v.

Mintie PENDERGRASS et al., Appellees.

Court of Appeals of Kentucky.

June 23, 1961.

Rehearing Denied Oct. 13, 1961.

John C. Anggelis, Lexington, for appellants.

Earl B. Rose, Beattyville, for appellees.

PALMORE, Judge.

In this action the appellees, owners of certain undivided mineral interests in a tract of land located in Lee County, Kentucky, obtained a judgment in the circuit court declaring an oil and gas lease to be terminated. The owners of the leasehold appeal.

The property involved is part of a larger acreage on which a number of producing oil wells had been drilled and operated under a lease or leases made some 40 years ago. By 1951 these wells had petered out and were abandoned. However, there had been some secondary recovery in the local field through waterflooding projects, and it is evident that this type of recovery was envisaged by the respective parties to the lease now in question.

The lease was executed on July 26, 1951. For the purposes of this case its salient provisions are as follows:

"It is agreed that this lease shall remain in full force for a term of one year from this date and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced from said leased premises *or operations are continued for the injection of water, brine and other fluids into subsurface strata."* (Emphasis added.)

\*     \*     \*     \*     \*     \*

"If the lessee shall commence to drill a well within the term of this lease or any extensions thereof, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch and if oil and gas, or either of them be found in paying quantities this lease shall continue to and be in force with like effect as if such well had been completed within the term of years first herein mentioned."

\*     \*     \*     \*     \*     \*

"In the event the first well drilled on the above land is dry, then and in that event, if a second well is not commenced within nine months, this lease shall terminate and be null and void."

All operations under the lease were conducted by N. P. Gasaway, one of the original lessees. He commenced drilling for oil on July 21, 1952, and, after taking a core for testing purposes, plugged the well on August 9, 1952. The drilling contractor moved off to fill another engagement, and the core samples were stored until such time as they could be taken to Evansville, Indiana, for analysis. According to Gasaway's testimony, the intention was to seal the well only temporarily. However, on August 13, 1952, he received a notice from one or more of the lessors to vacate the premises because the lease had expired, following which, on August 29, 1952, he filed a suit in the Lee Circuit Court to enjoin any interference with his possession. That suit, in which a counterclaim was asserted seeking a declaration to the effect that the lease had expired, seems to have been abandoned by both sides shortly after September 21, 1953, when the circuit court entered an order denying injunctive relief and overruling the defendants' motion for a summary judgment on the counterclaim. Apparently the order was interlocutory and did not effectively determine the rights of the parties. It is not pleaded in this case.

Gasaway took no further steps to develop the lease until July 1, 1953, after his attorney advised him that the court either had made or was going to make a ruling in his favor. He then set about to procure a drilling rig and finally got one onto the leasehold on September 15, 1953. Beginning on September 24, 1953, the plug was drilled out of the well heretofore mentioned, a storage tank was installed, and the well was cleaned out, shot, equipped with necessary tubes and rods, and put on a pump.

After completing this first well on October 19, 1953, Gasaway moved the rig to one of the old abandoned wells and followed

the same procedure as with the well he had drilled.

Between November 16 and 22, 1953, the drilling rig was moved to a third location, this being another of the old abandoned wells, and again the same procedure was followed as with the first two.

On January 2, 1954, Gasaway moved to another of the old wells and proceeded to clean out and deepen it, but eventually gave it up and, on February 22, 1954, moved back to the first well for the purpose of deepening it. This project proved unsuccessful, so well No. 1 was plugged back to its original depth and put on the pump again around May 23, 1954.

To recapitulate, there are three wells on pump, the first being the one on which Gasaway was drilling at the end of the primary term of the lease, and the other two being old wells which he thereafter cleaned out, shot and re-fitted. All three of these wells are connected to a single tank. They represent the total production under the lease up to the time this suit was filed in December of 1955. This production was stipulated as being 55 barrels through August 1954 and 58 barrels from then through July 1955. No royalty ever has been paid to the lessors. The trial court found as a fact that the first well either did not produce oil in commercial quantities or else was never pumped with any degree of regularity.

■ It will be recalled that under the express terms of the lease the lessee had the right to drill to completion any well commenced during the primary term. But if the hole proved to be dry this extension was at an end, since the 9-month "dry hole" clause would not operate beyond the primary term. Vaughn v. Hearrell, Ky.1961, 347 S.W.2d 542. Assuming that the temporary plugging of the first well on August 9, 1952, in order to have the core analyzed, was not a cessation of the drilling operation theretofore commenced during the term of the lease, and assuming also that Gasaway's further delay during the time of the first lit-

igation could not be charged against him (cf. 58 C.J.S. Mines and Minerals § 202g, p. 485), neither of which points are necessary to decide, there came a time when that well was completed, and if it was not a producer the lease then expired by its terms.

Giving the very widest latitude to the lessee's position in this case, the first well finally was completed on or about May 23, 1954. Time has since proved that it was not then, and never has been since the execution of the lease, a producer "in paying quantities." Cf. Enfield v. Woods, 1923, 198 Ky. 328, 248 S.W. 842, 843.

Following the activities described above as culminating in May of 1954, Gasaway proceeded at once to drill one or more input wells for the injection of water in order to flood or force into the other three wells whatever oil remained in the sand stratum to which they had been drilled. He spent considerable sums of money in constructing a water well and conduits, together with pumping and purification facilities necessary to the process of waterflooding, with the result that at the time this case was tried, late in 1956, an engineer testified that "a good start" had been made toward successful production by waterflooding. This witness would not call it a successful operation as yet, but thought it probably could be made so, and that it "would possibly take a year" to get an increase of production.

■ Since its term was for one year "and so long thereafter as * * * operations are continued for the injection of water, brine and other fluids into subsurface strata," the appellants take the position that the lease was kept in force by the aforementioned waterflooding efforts. They contend, therefore, that the lessors must rely on forfeiture for non-development, under which theory there are various defenses that are not applicable if the question is limited to whether the lease had expired by its terms. But as we view this contract, it had expired before the waterflooding operation began. When the primary term ended, this operation, though it may have been con-

templated in futuro, did not exist in fact; nor was there any production. Hence the lease was held in force only by virtue of the provision that if the lessee should commence a well during the term he would have the right to drill it to completion "and *if* oil and gas, or either of them, be found *in paying quantities* this lease shall continue to and be in force * * * as if such well had been completed within the term" etc. (Emphasis added.) This provision is not ambiguous, and it solves the controversy. Had the well been a producer, thus keeping the lease in force, and had thereafter declined to a point at which waterflooding was resorted to as a secondary recovery method, we should then have been faced with the question of how long a lessee's unsuccessful experiments can keep a lease alive in the absence of production; but the hard fact is that under this lease there was never any primary recovery.

■ It is argued also that because Gasaway spent a large amount of money in his efforts to develop the lease the principle of equitable estoppel should operate against the lessors. However, considering the fact that the lessors have engaged in at least two lawsuits to stop him we are unable to find any rational basis for estoppel.

■ The record on which this appeal was brought shows that the judgment was entered on July 20, 1959, and that the notices of appeal were filed 39 days later, on August 28, 1959. Since timely filing of the notice is mandatory, Electric Plant Board of City of Hopkinsville v. Stephens, Ky.1954, 273 S.W.2d 817, we dismissed the appeal sua sponte. Appellants thereupon filed a petition for rehearing, supported by an affidavit of the attorney who represented them in the circuit court showing that the judgment actually was entered on July 30, 1959. This affidavit was made on March 15, 1960, well before submission of the issues on appeal. In the petition for rehearing counsel states that he noticed the discrepancy in the record and obtained the affidavit for use in event the question should be raised. He

took no action to correct the misprision, as would have been the proper procedure under CR 75.08, but waited to see if it would escape attention. This tactic has resulted in an imposition on the court and on the many other litigants and lawyers whose cases are under submission awaiting its attention. A clerical error, if it is of sufficient importance to require correction, should be remedied promptly when discovered.

■ Though we have modified our opinion by extending it to the merits, we do not wish it to stand as authority for the proposition that an error in the record, of which the party adversely affected by it is aware in ample time to have it duly corrected, can be first brought to this court's attention after decision and then corrected on a rehearing. Hence the petition for rehearing will be overruled.

■ The controversy between counsel for appellant and the circuit court clerk regarding costs of the transcript may be resolved by the trial court under KRS 28.120.

Appeal dismissed.